UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
NORA ALBERTIN,

                    Plaintiff,

      -v-                         1:18-CV-1422

NATHAN LITTAUER HOSPITAL AND
NURSING HOME,

                   Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

APPEARANCES:               OF COUNSEL:

SOVERN LAW, PLLC        CHERYL L. SOVERN, ESQ.
Attorneys for Plaintiff
100 Saratoga Village Boulevard
   Suite 371
Malta, New York 12020

BOND, SCHOENECK & KING, PLLC   SANJEEVE K. DeSOYZA, ESQ.
   ALBANY                   PAUL BUEHLER III, ESQ.
Attorneys for Defendant
22 Corporate Woods Boulevard
   Suite 501
Albany, New York 12211

DAVID N. HURD
United States District Judge

## MEMORANDUM-DECISION and ORDER

## I. INTRODUCTION

   Plaintiff Nora Albertin ("Albertin" or "plaintiff") worked in human

resources for defendant, the Nathan Littauer Hospital and Nursing Home

("NLH" or the "Hospital"), for many years.  In fact, plaintiff was into her third decade as a Hospital employee before their working relationship fell apart.  But fall apart it did.  Towards the end of her tenure, plaintiff alleges that she was forced to work overtime without pay for years in violation of the Fair Labor Standards Act ("FLSA") and its analog under the New York Labor Law ("NYLL").  At the same time, plaintiff claims that her supervisors Lesa Grosse ("Grosse") and Lana Wydra ("Wydra") tried to punish her for taking leave to care for her and her husband's illnesses using the Family and Medical Leave Act ("FMLA").

On November 21, 2017, Albertin resigned from her position at Grosse and Wydra's urging.  On December 7, 2018, she filed a nine-count complaint in this district against NLH alleging: (I) unpaid overtime in violation of 29 U.S.C. § 207(a) of FLSA; (II) unpaid minimum wages in violation of 29 U.S.C. § 206(a) of FLSA; (III) unpaid overtime in violation of NYLL § 160; (IV) unpaid minimum wages in violation of NYLL § 652; (V) claims for failure to pay wages in violation of NYLL §§ 190, 191, and 663(1); (VI) failure to provide a proper wage notice in violation of § 195(3); (VII) FMLA leave interference in violation of 29 U.S.C. §§ 2614(a)(1)(A) and 2615(a)(1); (VIII) retaliation in violation of 29 U.S.C. § 2615(a)(1) of the FMLA; and (IX) punitive damages.

NLH moved for summary judgment against the entirety of Albertin's complaint on October 23, 2020.  That motion has been fully briefed and will be considered on the submissions without oral argument.

## II. BACKGROUND

There are three narrative threads running through Albertin's complaint, and addressing NLH's motion requires an understanding of each one.  First, some time needs to be spent clearing up how plaintiff came to be employed by the Hospital and the types of work she did on a typical day.  Second, plaintiff had a difficult relationship with her supervisors, Wydra and—especially—Grosse, that will require some explanation.  Third, plaintiff's and her husband's medical conditions and her taking FMLA leave to address those conditions becomes important to provide context both for the end of plaintiff's employment with the Hospital and her FMLA claims in this case.

### A. Albertin's Employment History and Job Responsibilities

NLH hired Albertin in June of 1989, and she began working in the Hospital's human resources ("HR") department in 2005.[1]  Dkt. 37-6, Defendant's Statement of Material Facts ("DSMF"), ¶ 4.  Plaintiff's first job in HR was HR Assistant, a role that she filled from 2005 until April of 2013.  *Id.* ¶¶ 4, 6.  In 2007, early in plaintiff's tenure as an HR assistant, Wydra was

---

[1] The facts are taken from the Hospital's statement of material facts where admitted by plaintiff, or from other record evidence.  Disputed facts are flagged and supported by citations to either the proponent's statement of material facts or to record evidence.

hired by the Hospital as Vice President of HR.  *Id.* ¶ 5.  As far as the record tells, plaintiff has no complaints about her role as an HR assistant or the Hospital's treatment of her while she occupied it.

Less so for the position of HR Generalist, a title NLH bestowed on Albertin in April of 2013.  DSMF ¶ 6.  As an HR Generalist, plaintiff's responsibilities included "maintain[ing] records of all Accessions, Terminations, Leave[s] of Absence[ ], Transfers[,] and Status Changes" for Hospital employees.  Dkt. 37-2, p. 16.[2]  She was also responsible for making employee reports available to Wydra, as Vice President of HR, as well as to the Hospital's CEO.  *Id* at 17.

In addition, the HR Generalist job description includes a twenty-three paragraph list of essential job functions.  Dkt. 37-2, pp. 16-18.  Those functions involve a sundry list of tasks involving maintaining employment records, processing employment transactions, and compiling and verifying reports that the parties do not meaningfully address and which do not meaningfully alter the Court's analysis in this case.  *See id.*

However, there are a few paragraphs that the parties have taken to arguing over.  Specifically, the parties disagree as to the extent to which the requirement that an HR Generalist "[e]nsure[ ] that all personnel/payroll

---

[2] Pagination Corresponds with CM/ECF.

transactions comply with [NLH's] policy and labor agreements" speaks to a Generalist's use of discretion in interpreting Hospital policy.  Dkt. 37-2, p. 16. Both parties similarly draw the Court's attention to an HR Generalist's responsibility to "[s]end[ ] termination notices . . . to all terminated employees."  *Id.*  An HR Generalist would also "[a]dvise[ ] management and employees regarding [the Hospital's] policy and labor agreements, in consultation with" the VP of Human Resources.  *Id.*  Finally, the parties argue as to the extent to which an HR Generalist's producing reports involved independent judgment as opposed to rote performance.  *Compare* DSMF ¶ 12, *with* Dkt. 41, Plaintiff's Statement of Material Facts ("PSMF"), ¶ 12.

   In addition to the job description's bird's eye view of an HR Generalist's responsibilities, the parties also provide a more personal look at Albertin's own experiences with that job title.  More specifically, the parties provide at least twenty examples of plaintiff carrying out her role as an HR Generalist. *See* DSMF ¶ 15(a-t).  The Hospital recounts how these examples illustrate plaintiff using her own judgment to interpret policy and NLH's various collective bargaining agreements to advise the Hospital's personnel managers.  *See generally id.*  Plaintiff denies nearly all of these allegations and counters that Wydra told her what to do in each case.  *See generally* PSMF ¶ 15(a-t).

5

On top of those responsibilities—and setting aside for the moment the
contours and extent of Albertin's independence and discretion in carrying
them out—plaintiff agreed to take on additional duties either in December of
2016 or in March of 2017.  DSMF ¶ 21 (alleging that Wydra asked plaintiff to
take on additional responsibilities in March of 2017); PSMF ¶ 21 (plaintiff
alleging that she took on additional duties in December of 2016).  Apparently,
when the Hospital's Benefits Coordinator was fired in December of 2016,
plaintiff split the fired employee's responsibilities with two of her coworkers,
Kathleen Deamer ("Deamer") and Cindy Jablonski ("Jablonski").  Dkt. 41-3
("Deamer Aff."),[3] ¶ 5; Dkt. 41-4 ("Jablonski Aff."), ¶ 4.[4]

 Because Albertin agreed to take on extra work, Wydra allowed her to be
paid overtime on a "straight pay" basis.  DSMF ¶ 22; Dkt. 44 ("Wydra Dep."),
pp. 113-15.  In HR practice, "straight" pay for overtime work means paying
an employee at her usual pay rate, as opposed to the time-and-a-half pay that
people often envision when thinking about overtime pay.  *See id.*; Dkt. 43,

---

[3] Both Jablonski and Deamer submitted two affidavits: one for the Hospital and one for plaintiff.
The short form citations to Deamer's and Jablonski's affidavits refer to plaintiff's.

[4] Defendant objects that neither of these affidavits rely on the personal knowledge of the affiant.
*See In re Bridge Constr. Servs. of Fla., Inc.*, 39 F. Supp. 3d 373, 383 (S.D.N.Y. 2014) (noting that
affidavits must be based on "personal knowledge, set out facts that would be admissible in evidence,
and show that the affiant or declarant is competent to testify on the matters stated").  However, both
Jablonski and Deamer are competent to testify as to what they personally observed working at the
Hospital as well as to "commonsensical inferences" rising from those observations.  *Id.*  The Court
will use these affidavits within these parameters.

p. 132.  Plaintiff does not dispute that she received straight overtime pay between March and early May of 2017.  DSMF ¶ 23.

On May 1, 2017, Albertin stepped into a new role as Employment Coordinator in the Hospital's HR department, though she kept her HR Generalist responsibilities.  DSMF ¶¶ 27, 32(d).  As an Employment Coordinator, plaintiff had a range of responsibilities, which included processing personnel requisitions, interviewing and evaluating applicants for vacant positions, verifying licenses and certifications for all new employees, processing job postings, determining eligibility and seniority for bids on open positions, making files for prospective hires, and "[e]xplain[ing] budget control and record requirements; answer[ing] questions and inquir[ing] or obtain[ing] information for department managers and supervisors with respect to procedure requirements."  Dkt. 37-2, p. 176.

Despite that second exhaustive list of job responsibilities, Albertin still insists that even as an Employment Coordinator, she did not independently interpret collective bargaining agreements or other policies, nor did she make significant recommendations on those procedures or on new hires. PSMF ¶ 31.  Much like it did for plaintiff's functions as an HR Generalist, NLH fires back with three examples of plaintiff performing her duties as Employment Coordinator that it contends demonstrates her using independent judgment.

NLH first points to an email chain in May of 2017, in which Albertin told an employee of the Hospital's health insurer that part-time employees were entitled to participate in health insurance.  Dkt. 37-1, pp. 420-21.  Plaintiff supported her claim by appending the applicable contractual language.  *Id.*  Plaintiff counters this example by explaining that she did not really interpret the Hospital's policies, she only found clear contractual language and shared it with the inquirer.  PSMF ¶ 32(a).

Next, NLH points to an email Albertin sent a manager in support of a job applicant.  Dkt. 37-1, p. 385.  Plaintiff notes that this was an unusual circumstance, however, because the job applicant she put forward was a personal acquaintance that she wanted to endorse.  *Id.*

As a third example, the Hospital points out that Albertin once suggested the best procedural path forward to transitioning a temporary employee to a permanent position.  Dkt. 37-1, p. 408.  Again, plaintiff argues that her role was minimal and that she only made that suggestion after conversing with the transitioning employee's manager and other HR staff.  Dkt. 41-1, ¶ 76(c).

In any case, Albertin's list of responsibilities was a healthy one, and she claims it took her more than an eight-hour workday to get everything checked off.  *See* Dkt. 41-1, ¶ 58.  In fact, plaintiff alleges that she struggled to get her tasks done within forty hours even before she became Employment Coordinator.  *Id.*  As a result, she claims that she would frequently work

8

between forty-one and forty-five hours per week, including occasional time on weekends. *Id.* ¶¶ 59, 66. In total, she estimates that she worked somewhere between 200 and 280 hours of overtime between May 2013 and November 21, 2017, *id.* ¶ 83, although, once again, she received straight overtime pay for her extra hours worked between March and May of 2017, Wydra Dep. 113-15.

At this point, a reader might wonder why Albertin cannot point to more specific time records to calculate her overtime with more certainty. According to plaintiff, she was told that she should not "swipe out" of NLH's timekeeping system because she was an exempt employee under FLSA. PSMF ¶ 25; Dkt. 41-1, ¶¶ 63-64. Plaintiff claims that she had always "swiped in" upon arriving at work, but only swiped out on a few occasions before being told that her swiping out would only be erased in any case, so she stopped swiping out. Dkt. 41-1, ¶ 64.

There was only one exception to Albertin's habit of not swiping out. Between March and May of 2017, when she was allowed to receive straight overtime pay, plaintiff would swipe out when she left for the day to keep track of the extra hours she worked. DSMF ¶ 24. Finally, plaintiff's pay stubs are similarly unhelpful in creating a more concrete record of her hours worked because, according to her, they only show forty-hour weeks and do not reflect the hours she actually worked on any given week. Dkt. 41-1, ¶ 62.

**B. Grosse Becomes Albertin's Supervisor**

Having set the scene with what exactly Albertin spent her time at NLH doing, as well as roughly how much time she claims she spent doing it, we can now turn to the narrative portion of plaintiff's claims.  Like all stories, plaintiff's is driven by conflict, and it is safe to say that the conflict in this case owes its beginning to Lesa Grosse taking over as HR manager in February of 2017.  DSMF ¶ 44; Dkt. 43, p. 19.

From the beginning, Albertin was skeptical of Grosse's qualifications as HR manager.  DSMF ¶ 44.  When Grosse was chosen for that role, plaintiff apparently complained to Wydra that she was a "bully" that had caused her fair share of HR complaints.  *Id.* ¶ 45.  Grosse was also new to HR, having had no experience in the field before taking the HR manager position.  Jablonski Aff. ¶ 6.  Nevertheless, plaintiff and Grosse apparently had no issues working together at the start.  *Id.* ¶ 46.[5]

Even so, the first cracks in their relationship began to form on May 1, 2017.  DSMF ¶ 46.  The weekend before, Deamer, one of Albertin's coworkers,

---

[5] Plaintiff objects that this paragraph relies on improper evidence because Local Rule for the Northern District of New York ("Local Rule") 65.1(a) notes that the record for a summary judgment motion "includes the pleadings, depositions, answers to interrogatories, admissions[,] and affidavits." According to plaintiff, the email defendant points to does not fall under any of those headings and therefore the paragraph it supports should not be considered.  However, the simple fact that the Local Rule uses the word "including" means that the types of evidence it lists is not intended to be exclusive.  *See, e.g., Robert H. Law, Inc. v. Woodbine Bus. Park, Inc.*, 2019 WL 1130121, at *11 n.31 (N.D.N.Y. Mar. 12, 2019) (holding that types of evidence listed in Local Rule 7.1(a) are nonexclusive list).  Accordingly, this argument is rejected wherever plaintiff raises it.

came in to move a filing cabinet out of the former Employment Coordinator's office and into plaintiff's.  *See* DSMF ¶ 47; Dkt. 41-1, ¶ 13.  Because plaintiff was in the office working anyway, she helped Deamer move the cabinet. Dkt. 41-1, ¶ 19.

By all accounts, Grosse was less than pleased.  On May 1, 2017, the next Monday, she asked Albertin and Deamer who had moved the cabinet. DMSF ¶ 48.  Plaintiff acknowledged that they had both moved it.  *Id.* ¶ 49. That same week, Grosse and Wydra brought plaintiff into Wydra's office for a meeting.  *Id.* ¶ 50.  Plaintiff's supervisors asked her who had moved the filing cabinet, and she responded that it was she.  *Id.* ¶ 51.  Plaintiff further explained that she thought she would need the files because they had belonged to the former Employment Coordinator, and plaintiff was preparing to step into that role.  *Id.*

According to NLH, Grosse issued Albertin a verbal warning for moving the filing cabinet without permission.  DSMF ¶ 52.  But plaintiff's recollection was that Wydra only told plaintiff she would "get a pass" this time but not to move furniture without permission again.  PSMF ¶ 52.  Plaintiff also claims that neither Grosse nor Wydra mentioned a "verbal warning."  *Id.* ¶ 52. Grosse and Wydra similarly called Deamer in for a meeting where, as Grosse

recalls, she told Deamer that her insubordination in moving the filing cabinet should not happen again.[6]  DSMF ¶¶ 54-55.

 After the drama surrounding Albertin's moving the filing cabinet, another of her coworkers, Jablonski, noticed that Grosse began to treat plaintiff and Deamer increasingly harshly.  Dkt. 37-5, ¶ 11.  For example, not long after the cabinet incident, Grosse ordered plaintiff to move into a different office.  DSMF ¶ 57; PSMF ¶ 57.

Perhaps understandably, Deamer decided that continuing to work under Grosse was not in her best interest and transitioned to per diem work away from the HR offices by June 28, 2017.  Deamer Aff. ¶ 14.  In her affidavit supplied by Albertin, Deamer claims that part of her motivation in leaving was watching Grosse be "overtly mean and nasty" to plaintiff.  *Id.*

But to be fair, Albertin similarly felt that Grosse was coming down especially hard on her.  According to a memo that plaintiff wrote on August 25, 2017, plaintiff had told Grosse and Wydra in a meeting in May of 2017 that she "felt like [she was] being treated unfairly, . . . harassed[,] . . . and bullied."  Dkt. 37-3, p. 31.  Plaintiff also claimed at deposition that Grosse began to target her within a couple of weeks of May 1 by adding demands to

---

[6] Plaintiff denies this fact because Deamer's Affidavit as submitted by the Hospital does not reference Grosse telling her that her insubordination should not happen again.  Dkt. 37-4, ¶ 12.  However, Grosse's affidavit supports the Hospital's point, and no material referenced by plaintiff makes its veracity questionable.  Dkt. 37-3, ¶ 19.  Because plaintiff has failed to actually contradict this point with record evidence, it will be deemed admitted.  Local Rule 56.1(b).

plaintiff's workload.  DSMF ¶ 62; PSMF ¶ 62.  At one point on or about May 17, 2017, plaintiff broke down in tears in front of some coworkers because she felt so mistreated by Grosse.  DSMF ¶ 64.

Albertin would also confide in Jablonski as to the stress working with Grosse caused her towards the end of May or beginning of June 2017. DSMF ¶ 65.  In one of these meetings, the extent of plaintiff's frustration with Grosse's treatment of her caused her to break down in tears.  *Id.*

### C. Albertin's FMLA Leave and Resignation

Unfortunately for Albertin, her frustration with Grosse and Wydra would continue to grow.  During the late May/early June of 2017 timeframe, Grosse continued to ramp up her concerns about plaintiff's productivity. DSMF ¶ 66.[7]

In early June of 2017, Grosse asked Albertin to email her outlining the tasks she had yet to accomplish.  DSMF ¶ 34.  On June 8, 2017, plaintiff provided that list.  *Id.* ¶ 35.  Grosse promptly replied and directed plaintiff to complete her tasks in a set order.  *Id.* ¶ 36.  Plaintiff responded at the end of the day, explaining the tasks she successfully completed, as well as those she did not.  *Id.* ¶ 37.

---

[7] Plaintiff nominally disputes this fact, and several others like it, without actually contradicting the narrative substance of the fact.  The Court will disregard these denials to the extent they do not point to record evidence that supports an alternate version of events.  *See* Local Rule 56.1(b) (noting that court may deem admitted any fact not specifically controverted by record evidence).

On June 12, 2017, Grosse followed up with Albertin about whether she had managed to complete her task list.  DSMF ¶ 38.  Plaintiff answered in the affirmative, with the exception of one of the tasks, that she still had not managed to check off the list.  *Id.* ¶ 39.  In response, Grosse charged plaintiff to send her an email at the end of every day detailing the tasks plaintiff had yet to complete.  *Id.* ¶ 40.  On June 15th, plaintiff sent the first of her daily update emails, a practice that she continued as instructed.  *Id.* ¶¶ 41-42.

In the background of Grosse's increased scrutiny, on May 23, 2017, Albertin applied for intermittent FMLA leave to care for her husband, who had been diagnosed with Alzheimer's Disease.  Dkt. 41-1, p. 35; DSMF ¶ 73. Plaintiff also applied for and received intermittent FMLA leave for her own health condition of anxiety attacks on June 9, 2017.  PSMF ¶ 163; Dkt. 41-1, ¶ 51.  Plaintiff's intermittent FMLA leave request for her anxiety was granted, as fate would have it, on June 12, 2017, the same day Grosse checked up on plaintiff's task list.  Dkt. 37-2, p. 180.

In the notice NLH provided to Albertin granting her intermittent leave request, the Hospital told plaintiff that she must "state FMLA" when calling out of work.  Dkt. 37-2, p. 180.  Plaintiff successfully invoked the Hospital's leave policy in July of 2017, when she took a three-week leave of absence from work.  DSMF ¶ 69.

14

During that leave of absence, every member of HR needed to absorb some of Albertin's typical responsibilities.  Dkt. 45, pp. 61-62.  According to Deamer, though, Grosse outsourced some of plaintiff's responsibilities that Grosse herself had absorbed to Deamer.  Deamer Aff. ¶ 15.  In one conversation, Deamer recalls Grosse saying that plaintiff was "out again."  *Id.*  When Deamer would finish plaintiff's tasks that Grosse had reassigned to her, she affirms that Grosse would require her to send those tasks back so that Grosse could submit them herself.  *Id.*

Jablonski perceived that Grosse began getting upset when Albertin would go on leave.  Jablonski Aff., ¶ 8.  Jablonski apparently inferred that work would pile up when plaintiff was not available and Grosse, being new to HR, did not understand how to handle the backlog.  *Id.*  Jablonski also affirmed that Wydra called her into her office during plaintiff's leave and asked if she thought plaintiff "went on FMLA [leave] to purposely ruin [her] vacation plans."  *Id.* ¶ 18.

The parties point to one final noteworthy detail concerning Albertin's leave of absence during July of 2017.  At some point while plaintiff was away, Grosse moved plaintiff's belongings out of her office and into the office that had belonged to her predecessor as Employment Coordinator.  Dkt. 43, p. 68.

On August 17, 2017, NLH finally approved Albertin's FMLA leave request, which plaintiff submitted back in May of that year, to be able to take

15

care of her husband as needed due to his Alzheimer's Disease.  Dkt. 41-1, p. 40.  The notice of approval provided plaintiff with the same leave requirements as her personal medical leave tasked her with; if she wanted to take FMLA leave, she needed to invoke "FMLA" in the leave request.  *Id.* Plaintiff admitted at deposition that she was aware of this requirement. Dkt. 43, p. 63.

On August 15, 2017, Grosse began a corrective action against Albertin, which came down in the form of a written warning on August 18, 2017. Dkt. 37-3, p. 24.  In sum and substance, during the course of Grosse's tracking plaintiff's productivity through daily emails, Grosse noticed that plaintiff had failed to complete four tasks on the day she had been assigned them.  *Id.*  As a consequence of plaintiff's written warning, plaintiff was put on notice that "[f]urther violations of work rules may result in disciplinary action up to and including suspension or discharge."  *Id.*  The written warning also directed plaintiff to seek guidance from Grosse in a "timely manner" if she had any questions.  *Id.*

In addition to the written warning, Grosse presented Albertin with a Performance Improvement Plan ("PIP").  DSMF ¶ 100.  The PIP required plaintiff to meet regularly with Grosse over the thirty-day period it covered. *Id.* ¶¶ 100-01.

Perhaps understandably, Albertin was less than pleased.  On August 25, 2017, plaintiff wrote a memorandum to Grosse asking her to expunge the written warning from her employment file.  Dkt. 37-3, p. 31.  In her memorandum, plaintiff reiterated that she was not aware that she had ever received a prior verbal warning, and thought that the immediate jump to a written warning was not justified for the misconduct of which Grosse accused her.[8]  *Id.*  Plaintiff closed by pointing out that she felt as though she were a "target."  *Id.*

Albertin sent a similar letter to Wydra on September 22, 2017.  Dkt. 37-2, p. 188.  In that letter, plaintiff detailed her previous track record of quality as an employee at NLH, including winning employee of the quarter at some point in her employment and being runner-up for employee of the year in 2016.  *Id.*  She reiterated that she felt that she was being bullied and saddled with more responsibility than she could manage alone.  *Id.*

The next week, Albertin attended her scheduled PIP progress meeting with Grosse.  DSMF ¶ 106.  Grosse made suggestions to improve plaintiff's

---

[8] The Hospital's Statement of Material Facts claims that the Hospital had a progressive discipline policy that generally proceeded from a verbal warning, to a written warning, to a suspension or final written warning, to a discharge.  DSMF ¶ 91.  However, the Hospital elaborates that that disciplinary scheme need not be followed in every case.  *Id.*  But the citation the Hospital uses to support those alleged facts makes no reference to the Hospital's discipline policy or its ability to deviate from it.  The Court therefore will not consider this fact.  Local Rule 56.1(a) (charging summary judgment movants to provide specific citation to record establishing fact).

performance, and indicated that Grosse should be the only person from whom plaintiff sought advice.  *Id.* ¶¶ 107-08.

On October 12, 2017, an NLH employee complained to Grosse that Albertin had confused her by requiring her to have a supervisor sign a form that she believed had already been signed.  Dkt. 37-3, p. 33.  Apparently, there was a great deal of uncertainty as to how precisely that particular process worked, because a second employee also complained about the same process, and plaintiff herself confessed confusion.  *Id.*  Plaintiff sought advice from Leslie Beadle ("Beadle"), an employee outside of the Hospital's HR department,[9] as to how the process worked.  *Id.*

Once again, Grosse was apparently vexed.  She told Albertin that she was plaintiff's direct supervisor, and that if plaintiff had a question she needed to go through her.  Dkt. 37-3, p. 33.  Grosse suspended plaintiff for a week as a consequence.  *Id.*  That suspension was without pay, but Wydra retroactively permitted plaintiff to use her time off to cover for the lost wages.  DSMF ¶ 116.  Plaintiff nevertheless argues that making her use her time off instead of converting her suspension to a paid one was irregular.  Dkt. 41-1, ¶ 41.

---

[9] Beadle was the Hospital's Vice President and Administrator.  Dkt. 37-2, p. 190.

On October 27, 2017, Albertin had another PIP progress meeting, this time with both Grosse and Wydra.  DSMF ¶ 117.  Once again, plaintiff's following Grosse's instructions and going only to Grosse with questions were topics of discussion.  *Id.* ¶¶ 118-19.

Albertin again successfully invoked NLH's FMLA leave policy on November 1, 2017, when she took a day off to attend an Alzheimer's conference.  DSMF ¶ 76.  The next day, plaintiff called in to say that she would not be coming into the office.  *Id.* ¶ 77.  According to plaintiff, she explained that she would not be able to make it into work because she had been up all night taking care of her husband, who had his days and nights reversed due to his Alzheimer's.[10]  Dkt. 43, p. 60.  According to Grosse, plaintiff only said that she "was not feeling well."  Dkt. 45, pp. 148-49.  The parties do not dispute, however, that the word "FMLA" never left plaintiff's mouth in the course of making this leave request.  PSMF ¶ 78.

On November 3, 2017, Albertin again called in to explain that her husband had kept her up all night.  *See* Dkt. 43, p. 61.  Grosse similarly contends that plaintiff only said that she was not feeling well.  Dkt. 45, pp. 148-49.  Once again, though, plaintiff does not dispute that she did not specifically invoke FMLA in calling out of work.  PSMF ¶ 80.

---

[10] The Hospital claims in its Statement of Material Facts that plaintiff provided no reason at all for her absence.  Yet none of the record evidence it points to supports that claim.  Accordingly, that claim is unsupported and will not be considered.  Local Rule 56.1(a).

Apparently having put this set of her husband's difficulties behind her, Albertin was able to successfully return to work. *See* DSMF ¶ 81. When plaintiff got back into the office, she spoke with Grosse about her leave the week before. *Id.* Grosse told her that because plaintiff did not specifically invoke the FMLA in calling in, her FMLA leave request was denied. *Id.* Instead, plaintiff's days out of work were charged as unscheduled absences, and plaintiff received paid time off instead. DSMF ¶ 82. Nevertheless, plaintiff was still concerned about how her leave was tabulated, because she affirms that having unexcused absences on her record could be a terminable offense. Dkt. 41-1, ¶ 48.

Albertin would attempt to take FMLA leave one last time during her employment at NLH. On November 15, 2017, plaintiff left work at 1:40 p.m. for her own medical condition. DSMF ¶ 84. Grosse and Wydra were at lunch at the time, so plaintiff left a post-it note on Grosse's door explaining that she needed to take FMLA leave for herself. *Id.* Plaintiff testified at deposition that Wydra and Grosse would normally take lunch in the Hospital's cafeteria, but there is no evidence that she definitively knew they were in the cafeteria at that time. Dkt. 43, p. 73. In any case, plaintiff made no other efforts to contact Grosse or Wydra. DSMF ¶ 86.

Remember, at this point Albertin had faced three disciplinary measures. First, she was chastised for moving the filing cabinet into her office on May 1,

2017 (although she did not interpret this encounter as a verbal warning, Dkt. 43, p. 27). Next, on August 18, 2017, Grosse issued her a written warning. Finally, Grosse suspended her on October 12, 2017.

Albertin's fourth and final disciplinary measure would come down on November 21, 2017. But first, a quick step back. A few minutes before plaintiff left work on November 15 due to her medical condition, she had sent an email raising concerns about NLH's policies for storing confidential employee records required by the Department of Health. Dkt. 37-2, p. 190. Specifically, plaintiff noted that the key to the filing cabinet where those records had been stored went missing while plaintiff's office was being moved back in July. *Id.* Despite plaintiff's request for some solution to the unlocked cabinet, it had remained unlocked ever since. *Id.* Apparently, the cabinet's unlocked state violated Department of Health guidelines and made plaintiff uncomfortable. *Id.*

Why was Albertin's email such a problem? The answer is simple enough: it was addressed to Grosse, Wydra, and Beadle, in that order. Dkt. 37-2, p. 190. To Grosse's mind, and by NLH's argument, this amounted to an insubordinate defiance of Grosse's orders that she was the only person from whom plaintiff should seek advice. DSMF ¶ 121. Plaintiff notes that she was not asking for a question or advice, but was instead trying to remedy an ongoing problem. PSMF ¶ 121.

In either case, Grosse met with Albertin on November 21, 2017 to discuss the behavior she perceived to be insubordinate.  DSMF ¶ 123.  In that meeting, Grosse gave plaintiff a corrective action form in response to plaintiff's sending the email.  *Id.* ¶ 125.  Plaintiff was given the choice to resign and collect her accrued vacation time, or else she would be fired. *Id.* ¶ 126.  Plaintiff resigned.  *Id.* ¶ 127.

**D. Procedural History**

On December 7, 2018, Albertin filed the current nine-count complaint against NLH.  Dkt. 1.  The parties proceeded to discovery which, though relatively uneventful, did shed light on some few relevant events occurring after plaintiff's resignation.

To begin, Albertin complained to NLH's CEO after her firing that Grosse subjected not just her but the entire HR department to a "hostile work environment." DSMF ¶ 132.  That Grosse apparently made work miserable for other HR employees is similarly clear based on Deamer's resignation. DSMF ¶ 137.  Jablonski also ended up leaving, and Deamer and plaintiff both objected to Grosse's treatment of her as well.  DSMF ¶ 133.  Grosse's current subordinates have similarly complained about her supervisory tactics.  *Id.* ¶ 140.  The Hospital also draws the Court's attention to notes plaintiff compiled after her termination blaming her firing on "retaliation for concer[n]s regarding" Department of Health regulations and privacy,

although as plaintiff correctly notes the same document references plaintiff's FMLA denial as a point of contention as well.  Dkt. 37-1, p. 335.

Having compiled the voluminous record discussed above, as previously noted NLH has moved for summary judgment against Albertin's complaint in its entirety.  Dkt. 37.  This decision now follows.

## III.  <u>LEGAL STANDARD</u>

Summary judgment under Rule 56 is warranted if the entirety of the parties' submissions show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012) (citing FED. R. CIV. P. 56(a)).  A fact is "material" if it "might affect the outcome of the suit under the governing law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  And a dispute of a material fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.*  The movant bears the burden of pointing the court to the materials that it believes demonstrate the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

Additionally, a court considering a summary judgment motion "must resolve any ambiguities and draw all inferences from the facts in a light most favorable to the nonmoving party."  *Ward v. Stewart*, 286 F. Supp. 3d 321, 327 (N.D.N.Y. 2017) (citing *Jeffreys v. City of New York*, 426 F.3d 549, 553

(2d Cir. 2005)).  Even so, a non-movant's conclusory allegations without support from record evidence are insufficient: the non-movant must "put up or shut up."  *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000).  At bottom, summary judgment tasks the Court with assessing the assembled evidence and determining whether a reasonable factfinder could find in the nonmovant's favor.  *Treglia v. Town of Manlius*, 313 F.3d 713, 719 (2d Cir. 2002).

## IV. **DISCUSSION**

Albertin's claims fall under five general headings: (1) overtime claims; (2) minimum wage claims; (3) failure to provide wage notice claims; (4) failure to pay wages claims; and (5) FMLA claims.  The Court will consider NLH's arguments against each of these batches of claims in turn.

### A. **Overtime**

Generally speaking, FLSA prohibits an employee from working more than forty hours per week unless she is paid at least "one and one-half times" her regular pay rate for every hour she works after her fortieth. 29 U.S.C. § 207(a)(1).  That said, some classes of employees are excluded from FLSA's overtime requirements including, as relevant here, an employee "employed in a bona fide . . . administrative capacity."  29 U.S.C. § 213(a)(1).

Digging into whether an employee meets a FLSA exemption involves one question of fact and one question of law.  *Ramos v. Baldor Specialty Foods,*

*Inc.*, 687 F.3d 554, 558 (2d Cir. 2012).  What an employee actually did on a day-to-day basis is a question of fact.  *Id.*  Whether those daily activities brought the employee within the ambit of a FLSA exception is a question of law.  *Id.*  Under either prong of the exemption test, the employer bears the burden of proving that the employee fits within an exemption and the exemption must be narrowly construed against the employer.  *Id.*

Keeping the requirement of narrow construction in mind, the administrative capacity exemption is defined by 29 C.F.R. § 541.200(a)(1)-(3).  There are three requirements to meet the administrative capacity exception: (1) the employee must earn at least $684 per week;[11] (2) the employee's primary duty involves office or non-manual work "directly related to the management or general business operations of the employer"; and (3) the employee's primary duty must include "the exercise of discretion and independent judgment with respect to matters of significance."  *Id.*

The parties both acknowledge that Albertin fits within the first two prongs of the administrative capacity exception and save their argument for the third.  Plaintiff's narrative paints her as a cog in the HR machine, reporting to Wydra and Grosse on all matters of significance.  Defendants, predictably,

---

[11] Plaintiff received a letter from Wydra dated November 18, 2016, indicating that going forward plaintiff's exempt status would be revoked.  DSMF ¶ 17.  That letter anticipated that regulations would hike the weekly salary threshold to meet the administrative capacity exception to $913 per week.  *Id.* ¶ 18.  That increase never took effect, and plaintiff was never removed from FLSA exempt status.  *Id.* ¶¶ 19-20.

would have the Court believe that the record plainly shows plaintiff making consequential and independent decisions throughout her tenures as both HR Generalist and Employment Coordinator.

Before the Court delves too deeply into that clash of narratives, however, there are a few finer details of the third prong of the administrative capacity exception that could use some fleshing out.  First, the exception refers to an employee's "primary duty."  Perhaps obviously, a duty is "primary" if it is the "principal, main, major[,] or most important duty that the employee performs."  *Ik Ho Choi v. Home & Home Corp.*, 2019 WL 4193449, at *3 (E.D.N.Y. Sept. 3, 2019) (citing 29 C.F.R. § 541.700(a)).  Though it is often informative, an employee's spending more than fifty percent of her time on a particular duty or set of duties does not by itself end the primary duty analysis.  *Id.*

Instead, the regulations provide a nonexclusive list of factors for courts to consider, including: (1) the time spent on exempt duties as opposed to nonexempt duties; (2) the employee's relative freedom from direct supervision; (3) the relative importance of the employee's exempt duties as compared with other types of duties; and (4) the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work typically performed by the employee. 29 C.F.R. § 541.700(a).

26

Second, some definition will be needed for the phrase "the exercise of discretion and independent judgment with respect to matters of significance." 29 C.F.R. § 541.200(a)(3). "The exercise of discretion and independent judgment implies that the employee has authority to make an independent choice, free from immediate direction or supervision." *Id.* § 541.202(c). However, that the purportedly exempt employee's recommendations are subject to review at a higher level does not mean that the employee is automatically non-exempt. *Id.*

For comparison's sake, 29 C.F.R. § 541.202(b) provides another nonexhaustive list of factors courts consider in deciding whether an employee exercises discretion and independent judgment.   As relevant to this case, a similarly nonexhaustive subset of that list includes: (1) "whether the employee has authority to formulate, affect, interpret, or implement management policies or operating practices"; (2) "whether the employee has authority to commit the employer in matters that have significant financial impact"; (3) "whether the employee has authority to waive or deviate from established policies and procedures without prior approval"; (4) "whether the employee investigates and resolves matters of significance on behalf of management"; and (5) "whether the employee represents the company in handling complaints, arbitrating disputes[,] or resolving grievances." *Id.*

Having teased out the parameters of the discretion and independent judgment inquiry, let us turn back to the record and how the parties would have the Court view it.  Doing so presents the Court with an easy question and a close question.

To resolve the easy question first, Albertin has presented a question of fact as to whether she exhibited discretion and independent judgment as an HR Generalist.  Although NLH furnished an extensive list of moments throughout plaintiff's time in that role that it contended demonstrated her using independent judgment, DSMF ¶ 15(a-t), plaintiff denied that she did any more than parrot Wydra's recommendations, PSMF ¶ 15(a-t).

NLH objects that Albertin's affidavit denying this laundry list of encounters relies frequently on her claiming what she "would have" done and is thus improper speculation.  *See* Dkt. 41-1, ¶ 70(a-t) (plaintiff affirming she "would have consulted with Wydra" on all matters of importance).  The Court acknowledges that plaintiff cannot rely on speculation to survive summary judgment.  *See Kulak v. City of N.Y.*, 88 F.3d 63, 71 (2d Cir. 1996) (noting that courts must accept as true allegations of party resisting summary judgment but that "conclusory statements, conjecture, or speculation" are not enough to defeat summary judgment).  However, setting aside the broad and speculative language plaintiff periodically invokes, she still disputes every

factual allegation with a specific rebuttal supported by the record.  *See generally* PSMF ¶ 15(a-t).

In short, a reasonable jury could look at NLH's showing, decide that Albertin had significant independence and discretion even as an HR Generalist, and find that the Hospital properly classified her as exempt.  But that jury could also listen to plaintiff's testimony, couple it with the extent of oversight Wydra and especially Grosse exhibited, and determine that plaintiff was improperly classified as exempt.  In the absence of a compelling reason to discredit plaintiff's dispute of the Hospital's facts purporting to show discretion and independent judgment, the Court cannot grant summary judgment in the Hospital's favor on plaintiff's FLSA overtime claims.[12]  *See, e.g.*, *Ozawa v. Orsini Design Assocs., Inc.*, 2015 WL 1055902, at *5-6 (S.D.N.Y. Mar. 11, 2015) (denying summary judgment motion where plaintiff denies factual predicates for defendant's argument plaintiff exercised independent judgment and discretion).

Having resolved the more straightforward question of whether summary judgment is warranted against Albertin's claims as an HR Generalist, the

---

[12] The Court notes, however, that when the time comes to assess damages, some of plaintiff's time spent as an HR Generalist will fall outside of FLSA's two-to-three year statute of limitations. *Glass v. A.K. Allen Co., Inc.*, 2010 WL 11632764, at *2 (E.D.N.Y. Oct. 21, 2010).  But the Court also notes that NYLL's statute of limitations for the same claim is six years.  N.Y. LAB. LAW § 663(3).

Court is left with the closer question of whether plaintiff was exempt as an Employment Coordinator.

NLH has made a strong showing that she was.  In particular, Albertin's answering a question posed by the Hospital's health insurer citing contractual language suggests that plaintiff exhibited independent judgment. Dkt. 37-1, pp. 420-21.  Plaintiff making a recommendation as to how to transition a temporary Hospital employee into a permanent position similarly smacks of her discretion.  *Id.* at 408.  Plaintiff's more general obligations to "[e]xplain budget control and record requirements," not to mention her obligation to "answer[ ] questions and inquire[ ] or obtain[ ] information for department managers and supervisors with respect to procedure requirements" bolster the Hospital's position that plaintiff was FLSA exempt that much more.  Dkt. 37-2, p. 176.

Even so, Albertin fights back.  She claims that she did not truly "interpret" NLH's contracts.  PSMF ¶ 32(a).  Instead, plaintiff claims she only provided language directly on point to answer the insurer's question, and thus exercised no discretion.  *Id.*  Plaintiff similarly downplays her involvement in transitioning the temporary employee by claiming she only responded to one out of thirty-two emails, and that Wydra set the date for the transition that plaintiff presented.  *Id.* ¶ 32(c).

Albertin's denials of the instances in which she arguably exhibited discretion as an Employment Coordinator are not so complete as her denials of her discretion as an HR Generalist.  However, plaintiff has one final weapon in her argumentative arsenal that gives pause.

That weapon is this.  Every time that Albertin faced discipline as an NLH employee, the Hospital claims that it was because she made an independent choice or did not come to Grosse for guidance before acting.  Plaintiff moved a filing cabinet without Grosse's permission, and arguably received a verbal warning.  DSMF ¶¶ 47, 50-52.  Plaintiff did not complete her tasks in the order Grosse imposed and the timeline she demanded, so she received a written warning which included a direction to "timely" ask Grosse any questions she might have.  Dkt. 37-3, p. 24.  Plaintiff asked someone other than Grosse a question, so Grosse suspended her and ordered plaintiff to only ask her for advice.  *Id.* at 33.  Finally, plaintiff included Beadle in addition to Grosse and Wydra on an email, and plaintiff was forced to resign. DSMF ¶¶ 123, 125-27.

It is impossible for the Court to conclude that no reasonable jury would find that Albertin did not exercise independent judgment and discretion when NLH's own side of her employment story is that she acted

insubordinately by not adhering to Grosse's every directive.[13]  The backdrop

of Grosse's extensive control over plaintiff's carrying out her responsibilities

colors the evidence to such an extent that a reasonable jury could conclude

that plaintiff did not exercise independent judgment and discretion on

matters of importance during her time at the Hospital.  Accordingly, plaintiff

has created a jury question as to whether she was properly classified as

FLSA exempt as both an HR Generalist and as an Employment Coordinator.

However, NLH still stands on one last bastion supporting its motion for

summary judgment on Albertin's FLSA claims.   Specifically, the Hospital

argues that plaintiff has failed to provide evidence that she worked overtime

at all, let alone evidence sufficient to calculate how many hours she worked.

To the Hospital's point, an employee bears the burden of proving that she

worked overtime and was not properly compensated for it.  *Pineda v.

Masonry Constr., Inc.*, 831 F. Supp. 2d 666, 674 (S.D.N.Y. 2011).

Albertin's only proof regarding the hours she worked are estimates that

she worked between forty-one and forty-five hours per week totaling between

200 and 280 hours during the relevant timeframe.  PSMF ¶¶ 66, 83.  To hear

NLH tell it, plaintiff's rough estimate is not enough to make a jury question

out of whether she worked overtime.  The Hospital is mistaken.  It cannot

---

[13] Of course, plaintiff argues that the Hospital's stated reason of insubordination was pretext to cover for retaliating against her for exercising her FMLA rights.  Nothing in this section grapples with the merits of plaintiff's claims on that score.

blame plaintiff because there are no records of her working overtime despite its policy of not requiring plaintiff to—and according to plaintiff actively discouraging her from—swiping out to mark the end of her workday.  *See Rivera v. Ndola Pharmacy Corp.*, 497 F. Supp. 2d 381, 389 (E.D.N.Y. 2007) ("[T]he employer cannot be heard to complain that the damages lack the exactness and precision of measurement that would be possible had [it] kept records.").

If there were records showing that Albertin had routinely swiped out right when her shift was scheduled to end, NLH might have had a leg to stand on. However, as it stands all the Court knows is that plaintiff did work overtime for which she received straight pay and that plaintiff has estimated the hours she worked to the best of her ability.  DSMF ¶ 22; PSMF ¶¶ 66, 83.  Because the Hospital shares at least some blame for the lack of more concrete evidence of plaintiff's overtime hours, that showing is enough for plaintiff's overtime claims to survive summary judgment.  *Rivera*, 497 F. Supp. 2d at 389.

NLH's arguments against Albertin's overtime claims must be rejected, and those claims must survive the Hospital's motion for summary judgment.  *See, e.g.*, *Fermin v. Las Delicias Peruanas Rest., Inc.*, 93 F. Supp. 3d 19, 22-24, 42-43 (E.D.N.Y. 2015) (adopting report and recommendation calculating

damages attributable to employer based on employee's estimates because employer failed to keep accurate hourly records).[14]

## B. __Minimum Wage__

Albertin's next suite of claims argues that NLH denied her a minimum wage.  If that argument seems to strain credulity, given that plaintiff was paid a salary in excess of the minimum to make her FLSA exempt, plaintiff has an answer.  You see, according to plaintiff, she was not paid a wage *at all* for her overtime hours, and if she was paid nothing then she certainly was not paid a mandatory minimum.

Albertin's argument is clever, and perhaps even novel.  Other employees raising precisely the same overtime claims that plaintiff brings here have simply conceded that they have no viable minimum wage claims.  *See, e.g.*, *Hanna v. Am. Cruise Lines, Inc.*, 2019 WL 3231202, at *5 (D. Conn. July 18, 2019) (plaintiff conceding he had no potential minimum wage claims despite maintaining improper classification as exempt with resulting unpaid overtime).  However, unlike other employees before her, plaintiff presses on and insists that she still has a viable minimum wage claim.

---

[14] For the same reasons, plaintiff's overtime claims under NYLL must also survive.  *See, e.g.*, *Nakahata v. N.Y.-Presbyterian Healthcare Sys., Inc.*, 723 F.3d 192, 200 (2d Cir. 2013) (noting that NYLL explicitly incorporates FLSA definition of overtime).

Yet clever as Albertin's argument is, it misses the mark because the Court cannot allow plaintiff to recover twice for the same injury.  Throughout FLSA's legislative lifespan, courts have grappled with how to prevent savvy plaintiffs from maneuvering themselves into "double recoveries."  *See Brooklyn Sav. Bank v. O'Neil*, 324 U.S. 697, 715 (1945) (disallowing recovery of basic statutory wage and liquidated damages with interest to prevent giving employee "double compensation").  Courts have since applied the same principle to ensure that plaintiffs do not recover under both federal and state statutory schemes.  *See, e.g.*, *Chowdhury v. Hamza Express Food Corp.*, 666 F. App'x 59, 61 (2d Cir. 2016) (summary order) (precluding recovery of liquidated damages under both FLSA and NYLL because "double recovery is generally disfavored where another source of damages already remedies the same injury for the same purpose").

There is no reason to depart from that general rule in this case.  Albertin's overtime claims hinge on NLH improperly classifying her as an exempt employee under FLSA.  If she is correct on that score, she is entitled to compensatory damages for the hours she worked but for which she was not paid.  If the Court were to duplicate that analysis verbatim but substitute "minimum wage" for overtime, it would accurately represent plaintiff's minimum wage claims.  In fact, the parties do not even separate their arguments as to the merits of either of these claims.  As a result, to ensure

35

that plaintiff does not recover twice for the same injury, her minimum wage claims under both the NYLL and FLSA must be dismissed.[15]

At this point, it might be asked why Albertin's minimum wage claims are being cut instead of her overtime claims, or why both plaintiff's NYLL and FLSA claims will survive despite the similar potential for double recovery. The answer is simple.  When a plaintiff could potentially recover under both the NYLL and FLSA, "courts [generally] allow plaintiffs to recover under the statute that provides for the greatest relief."  *Sanchez v. Jyp Foods Inc.*, 2018 WL 4502008 at \*7 (S.D.N.Y. Sept. 20, 2018) (collecting cases).  Whether the plaintiff would recover more under FLSA or the NYLL is a question that courts routinely resolve after liability has been established.  *See Gamero v. Koodo Sushi Corp.*, 272 F. Supp. 3d 481, 487-88, 502-04 (S.D.N.Y. 2017) (determining whether to assess damages under NYLL or FLSA for overtime claims after bench trial).

On the other hand, in the unique circumstances of this case, there is no possibility that Albertin could recover as much for her minimum wage claims as for her overtime claims.

---

[15] The analysis for minimum wage claims under NYLL mirrors that of FLSA.  *Jemine v. Dennis*, 901 F. Supp. 2d 365, 375 (E.D.N.Y. 2012).  However, NYLL imposed a higher minimum wage during portions of plaintiff's employment at the Hospital.  *Compare* NY LAB. LAW § 652.1 (setting minimum wage at $8.00 on and after December 31, 2013, $8.75 on and after December 31, 2014, $9.00 on and after December 31, 2015, and $11.00 per hour on and after December 31, 2016), *with* 29 U.S.C. § 206(a)(1)(C) (setting federal minimum wage at $7.25 for entire relevant period).

The damages provision of FLSA applies the same test for minimum wage and overtime claims: the plaintiff must be paid the wages she was denied. 29 U.S.C. § 216(b) ("Any employer who violates the provisions of [FLSA's overtime and minimum wage provisions] shall be liable to the employee . . . affected in the amount of their unpaid minimum wages, or their unpaid overtime compensation . . . and in an additional equal amount as liquidated damages."). NYLL provides much the same damages rule by allowing the employee to recover the amount of any underpayment plus liquidated damages "equal to one hundred percent of the total" of the underpayments.[16]  N.Y. LAB. LAW § 663(1).

In other words, if Albertin proves that she was erroneously classified as exempt under FLSA's definition, she is entitled either to the wages that NLH did not pay her for hours she worked overtime because it classified her as exempt or double those wages including liquidated damages.  For her overtime claims, those wages would be calculated as one-and-a-half times her weekly salary broken down into an hourly rate.  29 U.S.C. § 207(a)(1).  For her minimum wage claims, those wages would simply be the minimum required at the time plaintiff worked those unpaid hours.  *See* N.Y. LAB. LAW § 652.1; 29 U.S.C. § 206(a)(1)(C).

---

[16] The employer can nevertheless escape liquidated damages by proving "a good faith basis to believe that its underpayment of wages was in compliance with the law[.]"  N.Y. LAB. LAW § 663(1).

Given the multiplier applied to Albertin's overtime claims and the inherently "minimum" nature of a minimum wage, there is no circumstance in which plaintiff could recover more for her minimum wage claims than for her overtime claims.  Accordingly, in light of the rule against double recovery—but in support of the rule favoring plaintiff recovering the maximum possible without recovering twice—plaintiff's minimum wage claims must be dismissed.  *See, e.g.*, *Sanchez*, 2018 WL 4502008 at *7 (awarding damages under NYLL but not under FLSA to ensure plaintiff recovers one maximum remedy as opposed to two).

## C. **Failure to Provide Wage Notices**

Albertin's next claim is a touch more mundane.  Plaintiff claims that defendant failed to provide her with accurate wage notices as required by NYLL § 195.3.  That statute requires employers to provide their employees with wage notices outlining certain pieces of information.  *Id.*  As relevant to this case, a wage statement must include "the regular hourly rate or rates of pay; the overtime rate or rates of pay; the number of regular hours worked, and the number of overtime hours worked" if the employee is not exempt from overtime compensation.[17]  *Id.*

---

[17] Once again, New York adopts FLSA's standard to determine whether an employee is exempt from overtime compensation.  *Nakahata*, 723 F.3d at 200.

NLH points to several pay stubs that it provided Albertin and argues that this is enough.  Dkt. 37-2, pp. 196-207.  For her part, plaintiff seems to concede that these notices are adequate in most respects.  However, she seems to argue that the record of hours worked on those wage statements were inaccurate because they presumed that she worked forty hours per week when she actually worked more.  Dkt. 41-1, ¶ 62.

As decided above, whether Albertin was exempt and entitled to notice of her overtime hours worked is an unresolved question of fact.  As a direct consequence, whether plaintiff was entitled to an accurate statement of the hours she actually worked and how many of those hours were overtime is similarly a question of fact.  Plaintiff's wage notice claim must therefore also proceed to trial.  *See, e.g.*, *Pierre v. Hajar, Inc.*, 2018 WL 2393158, at *6 (E.D.N.Y. Mar. 28, 2018) (noting that accuracy of wage statements as to overtime hours was question of fact sufficient to defeat summary judgment).

### D. Failure to Pay Wages

Albertin's next claim that NLH seeks to dispose of is for a failure to pay wages.  To support that claim, plaintiff relies on NYLL §§ 190 and 191.  Section 190 is a definition section, and most courts have held that nothing in that section serves to create a viable cause of action.  *See, e.g.*, *Jensen v. AR Glob. Invs., LLC*, 2020 WL 1322584, at *5 (S.D.N.Y. Mar. 20, 2020) (collecting cases).

However, § 191 is a different and much more complicated matter.  In fact, there is an active split within this Circuit as to whether that section affords plaintiffs a cause of action.  *See Sorto v. Diversified Maint. Sys., LLC*, 2020 WL 8413553, at *2 (E.D.N.Y. Nov. 15, 2020).  In support of § 191 creating a cause of action, New York State's Supreme Court Appellate Division, First Department, has suggested that there is an implied remedy under that statute.  *Vega v. CM & Assocs. Constr. Mgt., LLC*, 107 N.Y.S.3d 286, 288-89 (1st Dep't 2019).

Fortunately for the Court, it need not dive into that thicket in this case. Section 191 requires employers to pay wages with a particular frequency. N.Y. LAB. LAW § 191.  Albertin has not provided any evidence that NLH failed to pay her in the schedule that statute imposes for clerical workers, the best fit for plaintiff's role at the Hospital.  *See id.* § 191(d) (requiring advance notice of pay schedule for clerical workers and requiring payment on at least semi-monthly basis).  Because plaintiff has provided no evidence to support this hypothetical cause of action, her failure to pay wages claim under NYLL §§ 190 and 191 must be dismissed.[18]

---

[18] In any case, plaintiff failed to defend these claims from the Hospital's attack, and they are likely abandoned.  *See Jackson v. Fed. Express*, 766 F.3d 189, 196 (2d Cir. 2014) (noting that district courts have discretion to deem claims abandoned where counseled plaintiff does not defend claim on summary judgment but defends other claims).

## E. **FMLA Claims**

That brings the discussion of Albertin's back wage claims to a close, which turns the Court's attention to plaintiff's FMLA claims. The FMLA guarantees an eligible employee twelve workweeks of unpaid leave per year if she has a serious health condition making her unable to perform her job. 29 U.S.C. § 2612(a)(1)(D). Along the same lines, an employee can also use those same twelve weeks "to care for [a] spouse, or a son, daughter, or parent" if that family member suffers has a serious health condition. *Id.* § 2612(a)(1)(C).

There are at least two species of FMLA claims: interference and retaliation. *Woods v. START Treatment & Recovery Ctrs., Inc.*, 864 F.3d 158, 166 (2d Cir. 2017). Interference claims involve an employee being prevented from exercising her rights under the FMLA by her employer. *Graziadio v. Culinary Inst. of Am.*, 817 F.3d 415, 424 (2d Cir. 2016). By contrast, retaliation claims arise when an employee either exercises her FMLA rights or opposed conduct that the FMLA makes illegal. *Potenza v. City of N.Y.*, 365 F.3d 165, 168 (2d Cir. 2004). Albertin brings one of each, and the Court will address them in turn.

### 1. **FMLA Interference**

The Second Circuit recognizes five elements for a claim of FMLA interference: (1) the plaintiff is eligible for FMLA leave; (2) the defendant is

an employer as that statute defines the term; (3) the plaintiff was entitled to take leave under the FMLA; (4) she gave defendant notice that she would take leave; and (5) she was denied benefits to which she was entitled under the FMLA. *Graziadio*, 817 F.3d at 424.

There are two portions of federal regulations that provide a useful backdrop for Albertin's claims. First, 29 C.F.R. § 825.303(b) requires an employee making a second FMLA leave request to "specifically reference either the qualifying reason for leave or the need for FMLA leave." Second, 29 U.S.C. § 825.303(c) tasks an employee seeking leave that was unforeseeable to her to adhere to "the employer's usual and customary notice and procedural requirements for requesting leave, absent unusual circumstances." An employer may deny FMLA leave if the employee fails to demonstrate unusual circumstances justifying her failure to comply with defendant's leave request policy. *Id.*

Albertin's FMLA interference claims stem entirely from her three unsuccessful attempts to secure FMLA leave in November of 2017. DSMF ¶¶ 77, 80-81, 84. According to the Hospital, its policies required an employee seeking FMLA leave to actually use the word "FMLA" during the course of her leave request. DSMF ¶ 81. It is undisputed that plaintiff did not use the word "FMLA" when calling out of work on November 2 or 3, 2017. DSMF ¶ 78.

However, as Albertin correctly argues, that policy violates the FMLA. After all, "an employer cannot use its own notice policy to circumscribe an employee's rights under the FMLA[.]"  *Hill v. City of N.Y.*, 136 F. Supp. 3d 304, 343 (E.D.N.Y. 2015) (cleaned up).

Section 825.303(b) only requires an employee to "provide sufficient information for an employer to reasonably determine whether the FMLA *may* apply to the leave request" and the employee "need not expressly assert rights under the FMLA or even mention the FMLA[.]"  29 C.F.R. § 825.303(b) (emphasis added).  Once the employee has provided that information, the FMLA specifically puts the burden on the employer, not the employee, to "make further inquiry . . . before denying" a request for FMLA leave. *Coutard v. Mun. Credit Union*, 848 F.3d 102, 107-08 (2d Cir. 2017).

As a consequence, a policy requiring the employee to affirmatively use the word "FMLA" in seeking FMLA leave would remove the employer's burden of inquiring into the cause of an employee's leave.  *Coutard*, 848 F.3d at 107-08. Saddling an employee with a burden that the FMLA specifically imposes on the employer would of course circumscribe the employee's FMLA rights and could not withstand scrutiny.  *Hill*, 136 F. Supp. 3d at 343.  By extension, NLH's policy demanding that the employee use the word "FMLA" in requesting leave is impermissible.  The Hospital's motion for summary

judgment must be denied as to plaintiff's being denied leave on November 2 and 3.[19]

Turning to Albertin's claims concerning November 15, 2017, plaintiff only argues that she was chastised for failing to follow Hospital procedures by actually physically telling her supervisor that she needed to leave, which amounted to FMLA interference.[20]  There are two problems with plaintiff's arguments.  First, plaintiff has failed to point to any record evidence that she was actually chastised for failing to follow the required procedures on November 15.  Second, even if she was chastised, that does not amount to FMLA interference.

The closest recoverable claim to Albertin's November 15, 2017 interference claim that the Court can imagine would be an argument that NLH discouraged plaintiff from using leave.  A discouragement theory of FMLA interference can be proven by two methods.  The first requires the plaintiff to prove that she was actively discouraged from taking FMLA leave that she had initially requested.  *Reilly v. Revlon, Inc.*, 620 F. Supp. 2d 524, 535 (S.D.N.Y. 2009).  The second asks for proof that defendant's discouraging

---

[19] Of course, if a jury were to find that Grosse's recollection were correct and plaintiff only told the Hospital that she was not feeling well on November 2 and 3, the Hospital's duty to inquire would not necessarily have been triggered and the Hospital may escape liability on these claims.  *See Pesok v. Hebrew Union Coll.—Jewish Inst. of Religion*, 235 F. Supp. 2d 281, 290 n.10 (S.D.N.Y. 2002) (noting that employer's duty to inquire is not triggered based solely on employer's knowledge of prior medical events).

[20] Grosse testified at her deposition that she classified the time off plaintiff took as FMLA leave. Dkt. 45, p. 150.  That testimony is unchallenged.

conduct "would have dissuaded a similarly situated employee of ordinary resolve from attempting to exercise his or her FMLA rights." *Id.*

Albertin claims she was only chastised after she took her leave on November 15, 2017, so she cannot prove that any castigation she may have received would have discouraged her from taking leave she would have already taken. *Reilly*, 620 F. Supp. 2d at 535. Thus, her only path to recovery would be proving that being chastised for failing to follow the proper leave procedures would have dissuaded an employee of ordinary resolve from exercising FMLA rights. *Reilly*, 620 F. Supp. 2d at 535. She cannot.

Albertin does not suggest that she was chastised for the act of taking leave, only for the manner in which she requested it. Getting a tongue lashing for taking leave through the awkward mechanism of a post-it note on a door without following up in any way would not discourage an employee of ordinary firmness from taking FMLA leave as a matter of law. Therefore, to the extent plaintiff relies on the events surrounding November 15, 2017 to support her FMLA interference claim, that claim must be dismissed.

In sum, Albertin's claims of FMLA interference stemming from her being forced to take paid leave in place of FMLA leave on November 2 and 3, 2017, remain viable. However, her claim of FMLA interference from November 15, 2017 must be dismissed.

## 2. **FMLA Retaliation**

Yet simply because a reasonable jury could conclude that NLH interfered with Albertin's FMLA rights does not mean that her FMLA retaliation claim is similarly vital. For the purposes of summary judgment, that retaliation claim is construed under the burden-shifting framework built by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Potenza*, 365 F.3d at 168.

The burden starts with Albertin, and it tasks her with proving a four-part prima facie case: (1) she exercised a right protected under the FMLA; (2) she was qualified for her position; (3) she suffered an adverse employment action; and (4) the adverse employment action occurred under circumstances giving rise to an inference of retaliatory intent. *Graziadio*, 817 F.3d at 429.

To that end, a plaintiff has proven that the circumstances of her adverse action give rise to an inference of discrimination if "a causal connection exists between the plaintiff's protected activity and the adverse action taken by the employer." *Donnelly v. Greenburgh Cent. Sch. Dist. No. 7*, 691 F.3d 134, 152 (2d Cir. 2012) (cleaned up).

Of course, a plaintiff is free to establish a causal connection "directly, through evidence of retaliatory actions directed against the plaintiff by the defendant." *Littlejohn v. City of N.Y.*, 795 F.3d 297, 307, 319 (2d Cir. 2015). Direct evidence often involves "discriminatory statements or actions by employees who . . . have enormous influence in the decision-making process."

*Smith v. North Shore-Long Island Jewish Health Sys.*, 286 F. Supp. 3d 501, 514 (E.D.N.Y. 2018) (internal citations and quotation marks omitted).  Keep in mind, though, that "[a]lleged acts of retaliation must be evaluated both separately and in the aggregate, as even trivial acts may take on greater significance when they are viewed as part of a larger course of conduct." *Tepperwien v. Entergy Nuclear Operations*, 663 F.3d 556, 568 (2d Cir. 2011).

However, a plaintiff can also forge that causal connection "indirectly by showing that the protected activity was closely followed in time by the adverse action." *Colon v. Fashion Inst. of Tech.*, 983 F. Supp. 2d 277, 287 (S.D.N.Y. 2013).  Courts routinely use the date a plaintiff requested FMLA leave as a potential starting date to determine temporal proximity.  *See, e.g.*, *Gray v. Onondaga-Cortland-Madison BOCES*, 2020 WL 1029022, at *7 (N.D.N.Y. Mar. 3, 2020) (using date plaintiff submitted notice of medical leave to analyze temporal proximity).

If the plaintiff carries her initial burden of proving a prima facie case, the burden shifts to the defendant, who must demonstrate "a legitimate, non-discriminatory reason for its actions[.]"  *Graziadio*, 817 F.3d at 429. Finally, if the defendant manages that showing, the burden bounces back to the plaintiff, who must prove that the defendant's suggested reason was pretextual.  *Id.*

A plaintiff can prove pretext by "demonstrating weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate, nonretaliatory reasons for its action." *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 846 (2d Cir. 2013). But any weaknesses and implausibilities a plaintiff can show are "simply one form of circumstantial evidence that is probative of intentional discrimination[.]" *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147 (2000). A plaintiff's prima facie case itself may provide evidence of intentional discrimination as well. *See id.* ("The factfinder's disbelief of the reasons put forward by the defendant . . . may, together with the elements of the prima facie case, suffice to show intentional discrimination" (citation omitted)).

The parties cut to the chase on Albertin's retaliation claims, and neither party disputes any of the first three elements of plaintiff's prima facie case. Instead, the parties turn their attention to whether the circumstances surrounding plaintiff's departure from NLH permit a sufficient inference of retaliatory intent and whether plaintiff can prove that the Hospital's advanced reason for forcing her out—her insubordination in including Beadle in her email on November 15, 2017—was a pretext to cover a discriminatory motive.

NLH begins by attacking Albertin's prima facie evidence of a causal connection between her discipline and her FMLA leave. To hear the Hospital

48

tell it, the four-month gap between plaintiff successfully taking FMLA leave in July of 2017 and her termination on November 21, 2017 stretches too long to support an inference of discriminatory intent.  DSMF ¶¶ 69, 123, 127; *O'Reilly v. Consol. Edison Co.*, 173 F. App'x 20, 22 (2d Cir. 2006) (summary order) (holding that three-month gap between FMLA leave and termination is too long to sustain inference of discriminatory intent on temporal proximity alone).

That argument must be rejected.  From the outset, Albertin has provided at least some direct evidence of discriminatory intent and need not rely on temporal proximity alone.  *See Littlejohn*, 795 F.3d at 319 (noting that plaintiff can prove discriminatory intent through direct evidence).  Plaintiff's coworker Jablonski has affirmed that Wydra, a supervisor with substantial influence over the decision-making process regarding plaintiff's employment, asked whether plaintiff was using her FMLA leave to sabotage her vacation plans.  Jablonski Aff., ¶ 18; *see Smith*, 286 F. Supp. 3d at 514 (noting that plaintiff can prove discriminatory intent by presenting evidence of comments made by supervisors with decision-making authority).

Jablonski also affirmed that Grosse grew agitated when Albertin was out on leave, which Jablonski infers was caused by Grosse not knowing how to handle the resulting backlog of work.  Jablonski Aff., ¶ 8.  Plaintiff's direct

showing of discriminatory animus leaves her less beholden to the timeline than she would otherwise be.

However, even setting aside Albertin's direct evidence of discrimination, NLH's argument would still fail.  There is no dispute that plaintiff at least attempted to take FMLA leave on November 15, 2017, less than one week before she was forced out of the Hospital.  DSMF ¶ 84.

As a consequence, it is worth noting that NLH's attempt to draw the Court's attention to July as the relevant date for her most recent FMLA protected activity for her retaliation claims is a bit of a shell game.  Her denied leave requests are just as much an exercise of a protected right as her actually taking leave, and are just as effective for suggesting an inference of retaliatory intent.  *See, e.g.*, *Gray*, 2020 WL 1029022, at *7 (using leave request as basis of calculating temporal proximity).

In that light, Albertin requested to go on FMLA leave three times in the three weeks before she was terminated, and temporal proximity remains a viable part of plaintiff's prima facie case.  DSMF ¶¶ 77, 80, 84; *cf., e.g.*, *Zann Kwan*, 737 F.3d at 839, 847 (finding temporal proximity sufficient to satisfy prima facie case for Title VII retaliation claim when plaintiff was fired three weeks after lodging complaint).

 Moving past NLH's temporal proximity arguments, the Hospital makes two more attacks on Albertin's prima facie case.  Specifically, the Hospital

50

points out that plaintiff's volatile relationship with Grosse began with plaintiff's moving the filing cabinet on May 1, 2017, two months before her FMLA requests in that year.  DSMF ¶¶ 48-49, 52.  To the Hospital's point, if "timing is the only basis for a claim of retaliation, and gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise."  *Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 95 (2d Cir. 2001).

NLH raises a good argument, but it is far from good enough to convince the Court that no rational factfinder could side with Albertin.  After all, timing is once again not the only basis for plaintiff's claims, there is also the other evidence of direct discriminatory intent discussed above.

In any case, even keeping in mind the fact that Grosse and Albertin began butting heads before plaintiff first took FMLA leave, it is impossible to ignore the pattern between plaintiff's FMLA rights leading and consequences following.  Remember, plaintiff was first approved for FMLA leave on June 12, 2017, and Grosse cracked down on her productivity the same day by following up on her task list.  *Id.* ¶ 38; Dkt. 37-2, p. 180.  Then, plaintiff was moved out of her office in July of 2017, while she was on FMLA leave. Dkt. 43, p. 68.

The pattern continues.  On August 17, 2017, Albertin was approved for leave to care for her husband, and she received a written warning the next

51

day.  Dkt. 41-1, p. 40; Dkt. 37-3, p. 24.  Of course, Grosse had initiated the
written warning before plaintiff's leave request was approved, but in the
absence of any evidence to the contrary, a reasonable juror could infer that
Grosse was aware that the approval was coming when she started the
warning process on August 15, 2017.  Dkt. 37-3, p. 24.

Finally, Albertin was forced out of her job less than a week after a leave
request.  DSMF ¶¶ 84, 125, 127.  That all of these events would take place so
close in time to events concerning plaintiff's FMLA leave counterbalances
NLH's argument that her problems with Grosse predated her FMLA
requests.

Next, NLH argues that Albertin was not alone in feeling like Grosse
treated her unfairly.  The Hospital points to Jablonski and Deamer's
complaints that they, too, were mistreated as evidence of this point.
DSMF ¶¶ 133, 137.  Once again, that these two Hospital employees also left
based on their frustrations—specifically with Grosse—is evidence in the
Hospital's favor, but not nearly evidence strong enough to merit summary
judgment.  The direct evidence plaintiff has gathered is enough for a jury to
find in her favor, especially considering that Deamer still maintains that
Grosse was "overtly mean and nasty" to plaintiff.  Deamer Aff. ¶ 14.

Accordingly, Albertin has carried her initial burden and established a
prima facie case of FMLA retaliation.  But NLH is not done yet.  As its final

argument, the Hospital posits that it forced plaintiff out for the legitimate, nondiscriminatory reason of her insubordination, and that plaintiff has failed to carry her final burden of proving that reason to be pretextual.

In a vacuum, NLH's supplied reason of insubordination clears the threshold of a legitimate, nondiscriminatory reason.  The Hospital is correct that it has met its burden at the second stage of the retaliation analysis.

Even so, Albertin has comfortably presented a jury question as to pretext. Outside of the aforementioned vacuum, it bears emphasis that plaintiff was given the choice between being fired or resigning because she included someone other than Grosse and Wydra in an email.  Dkt. 37-2, p. 190; DSMF ¶ 121.  Of course, the Court acknowledges that plaintiff had been given stern warnings about asking anyone other than Grosse a question well before she included Beadle in the November 15, 2017 email.  Dkt. 37-3, p. 33. In fact, plaintiff had already been suspended once for asking Beadle's advice. *Id.*

But a factfinder would be justified in looking at the record and coming away from both of those disciplinary measures and finding them disproportionate enough to suggest that some other motive might be lurking underneath.  Perhaps that motive is simply interpersonal strife between Grosse and Albertin.  However, NLH has not made it unassailably clear that

that motive was not retaliation for plaintiff's exercising her FMLA rights as commanded by its burden on summary judgment.

A reasonable jury could: (1) look at Wydra and Grosse's decision to force Albertin out for a relatively trivial offense; (2) couple it with plaintiff's coworkers' support and claims that Wydra and Grosse had made comments about plaintiff's FMLA leave; (3) consider plaintiff's previously sterling track record, Dkt. 37-2, p. 188; and (4) track the pattern of plaintiff facing some kind of adversity near in time to her every FMLA-related event and come away from that evidence dissatisfied with NLH's explanation.  Even in the face of the Hospital's consistent position that it showed plaintiff the door over her insubordination, that reasonable jury would be justified in awarding a verdict to plaintiff on her FMLA retaliation claim.  That claim must survive to trial.

## V. <u>CONCLUSION</u>

The word "chemistry" gets a lot of use as a shorthand for how well two people get along.  Unlike most metaphors, which thrive on reduction, chemistry as a metaphor for personal interactions tends to work on more levels as more people are added.  Take the workplace.  The perfect balance of personalities in the perfect roles produces an efficient, relaxed environment, maximizing production without straining the employees, much like a

perfectly balanced chemical reaction produces the intended outcome without wasting resources.

However, just like using the wrong proportions or chemicals could result in any number of outcomes ranging from nothing to explosion, the wrong people in a workplace can ruin productivity or lead to climactic conflict.  This case, whatever its merits ultimately turn out to be, is a classic example of a bad reaction between two people that soured the entire complexion of NLH's human resources workforce.

That bad reaction has run its course, and all this time later there remain a number of unanswered questions concerning Albertin's employment at NLH.  None of those questions are for the Court to decide.  Trial alone can provide an answer.

Therefore, it is

ORDERED that

1. Defendant Nathan Littauer Hospital and Nursing Home's motion for summary judgment is GRANTED IN PART and DENIED IN PART;

2. Plaintiff Nora Albertin's claims under Counts: (II) minimum wage violations under FLSA; (IV) minimum wage violations under the NYLL; and (V) failure to pay wages under the NYLL are DISMISSED;

3. Plaintiff Nora Albertin's claim of FMLA interference stemming from November 15, 2017 is DISMISSED; and

4. Plaintiff Nora Albertin's claims under Counts: (I) overtime violations under FLSA; (III) overtime violations under the NYLL; (VI) failure to furnish proper wage statements under the NYLL; (VII) FMLA interference; (VIII) FMLA retaliation; and (IX) punitive damages remain for trial.

IT IS SO ORDERED.


Dated: May 4, 2021
  Utica, New York.

David N. Hurd
U.S. District Judge